UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DAVID MARC RATCLIFF,

      Plaintiff,

v.
                             Case No. 8:22-cv-2782-TPB-CPT

ALEXANDER EDGE, *et al.*,

      Defendants.

_____/

## O R D E R

This action is based on both the alleged use of excessive force, including blows to Ratcliff's head and bites from "K-9 Yoda," and the alleged failure to intervene to stop the use of excessive force. Ratcliff sues two groups of defendants: deputies of the Pinellas County Sheriff's Office ("PCSO Defendants") and officers of the Clearwater Police Department ("CPD Defendants"). The defendants removed the action from state court.

## I. BACKGROUND

Both groups of defendants move (Docs. 7 and 17) to dismiss the complaint under Rule 12(b)(6), Federal Rules of Civil Procedure. The PCSO Defendants seek dismissal because (1) Ratcliff failed to timely effect service of process, (2) no PCSO Defendant committed a constitutional violation, and (3) each PSCO Defendant is entitled to qualified immunity. The CPD Defendants seek dismissal because (1) Ratcliff failed to timely effect service of process, (2) the

complaint is a prohibited "shotgun pleading," and (3) both no CPD Defendant committed a constitutional violation and each is entitled to qualified immunity. An earlier order (Doc. 31) dismisses Defendant Extine because she was never served but otherwise rejects dismissing the action based on untimely service.

Also, the earlier order (Doc. 31) notes (1) that, in the complaint, Ratcliff refers to the existence of "video footage" taken by a bystander, by a police helicopter, and by officers' body cameras — evidence Ratcliff asserts will support his claims; (2) that both groups of defendants move to dismiss (Docs. 7 and 17) and support their motions with the video footage referenced in the complaint; (3) that the defendants request the court take judicial notice of the state court records showing Ratcliff's pending criminal charges that both preceded his arrest and resulted from his arrest; (4) that Ratcliff does not object to the defendants exhibits and, moreover, he attaches additional exhibits to his opposition (Doc. 25) to the motions to dismiss; and (5) that, as a consequence, under Rule 12(d) the motions to dismiss must proceed as motions for summary judgment: "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."

Lastly, the earlier order (Doc. 31) (1) explains that this action will proceed under Rule 56, Federal Rules of Civil Procedure, for summary judgment; (2) explains how a summary judgment under Rule 56 differs from a motion to

dismiss under Rule 12; (3) cautions Ratcliff about the finality of summary judgment; and (4) affords the parties an opportunity to supplement their arguments.  In accord with that order, Ratcliff and the two groups of defendants filed their supplements. (Docs. 35–38, respectively) Consequently, this action is ripe for decision on both of the converted motions for summary judgment. (Docs. 7 and 17, respectively)

## II.  MOTIONS FOR SUMMARY JUDGMENT

Entitlement to summary judgment depends on the undisputed facts. Under Rule 56(a), Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *Johns v. Jarrard*, 927 F.2d 551, 555 (11th Cir. 1991).   Viewed in the light most favorable to the non-moving party, the documents must show the absence of a genuine issue of material fact and the moving party's entitlement to judgment as a matter of law. *See generally, Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir. 1997); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590 (11th Cir. 1995).  Even though allegations in a *pro se* complaint are held to a less stringent standard than a formal pleading drafted by a lawyer (*Haines v. Kerner*, 404 U.S. 519 (1972) (*per curiam*); *Tannenbaum v. United States*, 148 F.3d 1262 (11th Cir. 1998)), the plaintiff's

allegation must have factual support. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1321 (11th Cir.) *reh'g and suggestion for reh'g en banc denied*, 182 F.3d 938 (11th Cir. 1999).

Once the movant presents evidence that, if not controverted, would entitle the movant to judgment as a matter of law, the burden shifts to the non-moving party to assert specific facts demonstrating a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Pennington v. City of Huntsville*, 261 F.3d 1262 (11th Cir. 2001). If one party's claim is implausible, that party must present more persuasive facts than necessary to show that a genuine factual issue exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). *See also Cuesta v. School Bd. of Miami-Dade County*, 285 F.3d 962, 970 (11th Cir. 2002) ("A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'"). A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *Anderson*, 477 U.S. at 248.

Ratcliff and the defendants disagree on the amount of and the necessity for the use of force. The defendants' "...version of events (unsurprisingly) differs substantially from [the plaintiff's] version. When things are in such a

posture, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the [summary judgment] motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007).  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. *See also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (explaining that for evidence to be discounted at summary judgment, it must be more than simply self-serving or unsubstantiated; the evidence must be "blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature");

Both Ratcliff and all the defendants rely upon videos taken by a bystander, by a police helicopter, and by officers' body cameras.  Under this circumstance, the uncontested video footage of the incident controls, as *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018), explains:

> When considering the record on summary judgment "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan [v. Cotton*, 572 U.S. 650, 651 (2014)] (quotation marks and alterations omitted). But in cases where a video in evidence "obviously contradicts [the nonmovant's] version of the facts, we accept the video's depiction instead of [the nonmovant's] account," *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010), and "view[ ] the facts in the light depicted by the videotape," *Scott [v. Harris*], 550 U.S. at 380–81, 127 S. Ct. at 1776 [(2007)].

*Accord Marantes v. Miami-Dade Cnty.*, 776 F. App'x 654, 665 (11th Cir. 2019)[1]

("The video clearly contradicts Marantes's claim that he was restrained and

subdued at the time.  Accordingly, we are obligated to "view[ ] the facts in the

light depicted by the videotape.") (quoting *Scott*) (brackets original); *Butler v.*

*Sec'y, Fla. Dep't of Corr.*, No. 20-11097, 2021 WL 4279555, at *3 (11th Cir. Sept.

21, 2021) (holding that, based on the video of the cell extraction, "there is no

genuine dispute of fact concerning whether the officers were justified in using

force or whether they used only the amount of force necessary to handcuff

Butler"), *cert. denied sub nom. Butler v. Dixon*, 142 S. Ct. 1213 (2022).

## III.  FACTS

Based on his alleged bank robbery spree in November, 2021, Ratcliff is

detained pending charges (1) in Hillsborough County for a November 18th bank

robbery while wearing a mask (Exhibit A, Doc. 7); (2) in Pinellas County for a

November 22nd bank robbery while wearing a mask during which he grabbed

$15,000 (Exhibit E–F, Doc. 7); and (3) in Pinellas County for a November 30th

bank robbery during which he took $3225 from the teller and during which he

implied that he had a gun (Exhibit B–C).[2]  The video from the police helicopter

---

[1] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. Rule 36-2.

[2] Based on the events immediately after the November 30th bank robbery, Ratcliff is also charged with attempted carjacking, intentionally causing harm to a police dog, and fleeing or eluding a law enforcement officer. (Exhibits B and D, Doc. 7) Also, the police report for the November 22 bank robbery notes under "Aggravating/Mitigating Factors: just did 25

tracks Ratcliff's vehicle from shortly after the last bank robbery and the pursuit that involved both deputies from the Pinellas County Sheriff's Office and officers from the Clearwater Police Department.  The helicopter video shows Ratcliff turning onto a residential street, park in a driveway (time: 11:08:06), exit and run across the street, and attempt to carjack a truck but was thwarted after struggling with the owner.  A K-9 unit patrol car driven by Defendant Dep. Edge passed the truck and stopped behind Ratcliff's car (11:08:58) (Ratcliff's struggle with the truck owner was unseen by Dep. Edge likely because it was occurring on the other side of the truck). Ratcliff abandoned trying to carjack the truck and started running down the residential street. When he was alerted by the helicopter that Ratcliff was fleeing, Dep. Edge released his dog, "Yoda," and both began to chase after Ratcliff (11:09:10)  The helicopter video shows Yoda run-down Ratcliff (11:09:16), who fights with the dog, and six seconds (11:09:22) later Dep. Edge joined the fray.  Dep. Edge's body camera shows that (before other officers arrive to assist) he attempts to gain control of Ratcliff by punching Ratcliff and yelling at him to both stop biting his dog and to put his hands behind his back.  Ratcliff admits to biting Yoda's ear.  (Doc. 35 at 7)

---

yrs prison for bank robbery." (Exhibit E, Doc. 7) The Florida Department of Corrections website has no record of Ratcliff, but the United States Bureau of Prisons' website shows that Ratcliff was released from imprisonment five months earlier on June 25, 2021, but neither the federal conviction nor the term of imprisonment is disclosed.

The video recordings from the helicopter, and from both Dep. Edge and the other police body cameras,[3] show that Ratcliff continued to fight Yoda, that Dep. Edge punched Ratcliff several times while yelling a Ratcliff to both stop trying to hurt his dog and to put his hands behind his back, and that additional officers arrived who also commanded Ratcliff to stop struggling and to put his hands behind his back.  Ultimately Ratcliff complied with the commands and was handcuffed, after which Yoda released his hold.

According to the helicopter video, 1 minute 17 seconds elapsed from when Yoda catches Ratcliff (11:09:16) until the handcuffs were secured (11:10:33). Dep. Extine's body camera video (marked as "Vehicle 8 Body Cam Video," Defendant's Exhibit G, Doc. 7) shows that Ratcliff complied with the commands and was handcuffed (11:10:32), three seconds later Yoda was ordered to release his grip (11:10:35), and nine seconds later Yoda released (11:10:44).

## IV.  ANALYSIS

Affording the *pro se* complaint a generous interpretation, *Haines v. Kerner*, 404 U.S. 519 (1972) (*per curiam*), Ratcliff alleges three claims: (A) the use of excessive force by Dep. Edge based on both his punching Ratcliff in the head and his handling of his police dog; (B) the failure of all of the other law

---

[3] Because the several videos are not perfectly synchronized, timing between the videos are not exact to the second and, consequently, the time when a specific act occurs in one video cannot be compared to the time that that same act or another act is depicted in another video.

enforcement officers to intervene to stop Dep. Edge's use of excessive force; and (C) a state law battery claim against Dep. Edge. Ratcliff alleges that Dep. Edge used constitutionally prohibited excessive force. To prevail on his claim against the defendants, Ratcliff must prove both that the force used was excessive and that the defendants are not entitled to qualified immunity from liability for Dep. Edge's use of excessive force. If the amount of force used was not excessive, the inquiry ends and the defendants are entitled to summary judgment. But if the amount of force was excessive, the defendants are still entitled to summary judgment if they meet the requirements for qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established."). As discussed below, the defendants' arguments for summary judgment prevail because the force used was not unconstitutionally excessive.

## A.  Use of Excessive Force:

### 1.  Fourth Amendment:

"...[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Nevertheless, the

Fourth Amendment's protection against unreasonable searches and seizures also protects against the use of excessive force during an arrest. *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) ("The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest."). "Reasonableness" determines whether the use of force is excessive in violation of the Fourth Amendment, as *Jackson v. Sauls*, 206 F.3d 1156, 1169–70 (11th Cir. 2000) (emphasis original), explains:

> The Supreme Court has instructed that "all claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

The reasonableness test is not based on the arresting officer's subjective intent; the standard is whether the officer's actions were objectively reasonable under the circumstances. "…[T]he 'reasonableness' inquiry in an excessive force case is an objective one:  the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. at 397.

Application of the reasonableness test …"requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of

the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Moreover, by necessity some deference is afforded to a police officer who makes an immediate decision in a stressful situation. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.*, at 396–97.

The uncontroverted evidence shows that Ratcliff fled from police following a bank robbery in which Ratcliff threaten his having a gun. Consequently, the situation Dep. Edge faced was a potentially armed bank robber (1) who had evaded police during a pursuit that involved members of both the Pinellas County Sheriff's Office and the City of Clearwater Police Department, (2) who had just attempted to carjack a truck, and (3) who was attempting to escape by running down the street away from Dep. Edge. Given these facts, Dep. Edge was fully justified in releasing Yoda to stop Ratcliff from escaping. *See, e.g., Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009) (determining that the use of a police dog to take-down a fleeing bank robber believed to be armed is not constitutionally prohibited use of excessive force).

The primary basis for Ratcliff's excessive-force claim centers on three actions by Dep. Edge: (1) repeatedly punching Ratcliff in the head, perhaps a

half-dozen times, (2) continuing to encourage Yoda to bite him, and (3) pulling on Yoda while the dog still had a firm grip on him. Because the first two allegations of use of excessive force by Dep. Edge occurred while Ratcliff was still fighting and not complying with commands to put his hands behind his back — and importantly before Ratcliff was fully restrained in handcuffs — the force employed by Dep. Edge was reasonable. *Crenshaw*, 556 F.3d at 1293 (recognizing that police officer's "...not call[ing] off the canine until he had handcuffed [the fleeing bank robber]" was justified because the officer "reasonably believed that [the defendant] was armed and dangerous"). Lastly, Dep. Edge's pulling on Yoda was clearly part of his getting Yoda to release his grip. As found above, Yoda released his grip approximately nine seconds after the deputy's command.

Any act that occurred after Yoda released his grip is irrelevant to determining whether the force employed was unconstitutionally excessive. Ratcliff assigns undue importance to Dep. Edge's use of expletives directed at him after Yoda released his grip. The videos show that Dep. Edge's words were a reply in kind to Ratcliff's expletives. Moreover, words cannot convert a use of force from constitutionally reasonable to unconstitutionally excessive. *Graham v. Connor*, 490 U.S. 386, 397 (1989) ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force . . . ."); *Kraus v. Martin Co. Sheriff's Office*, 753 F. App'x 668, 674 (11th Cir. 2018)

("[W]ords alone do not transform an acceptable use of force into one undertaken in bad faith."); *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997) ("In this inquiry, the officer's intent, whether evil or good, is irrelevant."). Likewise, Ratcliff assigns ill-will, malice, or bad faith to officers shown in some of the videos smiling, laughing, or "fist-bumping." The defendants in this action are not liable for actions by non-defendants and — even if some of the officers are defendants — due to a lack of audio the relevant videos fail to disclose the reason for those officers' actions. This court will not speculate about the officer's intent, nor will the court accept Ratcliff's speculation.

## 2. **Qualified Immunity:**

Qualified immunity protects government officials from all but the more egregious situations so that the public officials are free from meritless lawsuits. "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted). "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*,

311 F.3d 1340, 1346  (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

A qualified immunity analysis is not necessary because, as determined above, Dep. Edge's use of force was neither unreasonable nor excessive.  And even if Ratcliff could show that constitutionally prohibited excessive force was used, Dep. Edge would be entitled to qualified immunity because no caselaw at the time of Ratcliff's arrest established that, under these circumstances, the use of force was excessive.  *See Smith v. Mattox*, 127 F.3d at 1419 ("…[U]nless a controlling and factually similar case declares the official's conduct unconstitutional, an excessive-force plaintiff can overcome qualified immunity only by showing that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw.").  To the contrary, controlling caselaw advised that, under similar circumstances, the use of a police dog to apprehend a fleeing bank robber believed to be armed is not constitutionally prohibited use of excessive force.  *Crenshaw*, 556 F.3d at 1292.

## B.  Failure to Intervene:

Other than Dep. Edge, Ratcliff sues each of the other defendant law enforcement officers for their failure to intervene to stop Dep. Edge's alleged use of excessive force.  "[I]f a police officer, whether supervisory or not, fails or

refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." *Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019) (citing *Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998)). *Accord Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) ("An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance."). However, "[t]o be held liable, the officer must both be 'in a position to intervene' and 'fail[] to do so.'" *Sebastian*, 918 F.2d at 1312 (citing *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir. 2000)). A relevant consideration is whether the officer had time to intervene, *Marantes v. Miami-Dade Cnty.*, 649 F. App'x 665, 672 (11th Cir. 2016) (citing *Priester*, 208 F.3d at 925), and, as *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 740 n. 25 (11th Cir. 2010), explains, liability for not intervening depends upon the timing of events: "Because the relevant events happened so quickly, the record does not reflect any point at which Anderson could have intervened to prevent Norris's use of excessive force, especially pepper spray, on Brown. Anderson accordingly is not liable for failure to intervene in Norris's use of force." *See also Baker v. City of Madison, Alabama*, 67 F.4th 1268, 1281 (11th Cir. 2023) ("[E]ven assuming Officer Nunez's use of the taser was excessive, Officer Hose did not witness Officer Nunez's use of the taser and thus did not have the ability to intervene to

prevent that use of force.  The body camera footage shows that Officer Hose arrived at the scene more than two minutes *after* Officer Nunez fired his taser. That alone is fatal to Baker's claim.").

First, as determined above, because Dep. Edge's use of force was not unconstitutionally prohibited as excessive force, no other law enforcement officer had a duty to intervene. *See Crenshaw*, 556 F.3d at 1294 ("...[B]ecause [Deputy] Lister did not violate Crenshaw's right to be free from excessive force, [Deputy] Merritt had no attendant obligation to intervene."); *Callwood v. Jones*, 727 F. App'x 552, 560 (11th Cir. 2018) (holding that "officers had no duty to intervene" if the law did not clearly establish that the other officer used excessive force). Second, the video recordings show that Dep. Edge's punches occurred before the defendant law enforcement officers arrived and, nevertheless, before Ratcliff was securely handcuffed. *See Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1356 (11th Cir. 2015) ("[F]orce applied while the suspect has not given up and stopped resisting and may still pose a danger to the arresting officers, even when that force is severe, is not necessarily excessive."). Consequently, no law enforcement officer is liable for failing to intervene.

## C.  State Law Battery Claim:

The PCSO Defendants erroneously assert that Ratcliff alleges no state law claim for battery.  (Doc. 36 at 6)  To the contrary, on page 5 of his complaint

(Doc. 1, Attachment 1) Ratcliff asserts a claim under Section 784, Fla. Stat., "for aggravated battery after he was clearly in custody." In his supplemental opposition he recognizes that under Section 768.28(9)(a), a state officer is immune from "any action within the scope of his or her employment or function, unless the officer 'acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.'" (Doc. 35 at 20) Although Ratcliff is correct that no defendant has addressed the state law claim, as determined above Dep. Edge's actions were not contrary to the immunity provided under Section 768.28(9)(a). Consequently, Ratcliff's state law claim of battery fails as a matter of law.

## V. CONCLUSION

Under Rule 56, a party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." The videos depict the facts relevant to Ratcliff's claims. *Scott v. Harris*, 550 U.S. at 381 (stating that the facts are "viewed...in the light depicted by the videotape"). The video evidence conclusively shows that Ratcliff was fighting Yoda and the police officers and he was initially refusing to comply with the officer's orders to put his hands behind his back. Based on the videos, no reasonable juror would find that Dep. Edge's use of force was unreasonable under the circumstances, or to remove the negatives,

any reasonable juror would find that Dep. Edge's use of force was reasonable under the circumstances.

Accordingly, the Defendants' motions (Doc. 7 and 17) to dismiss, converted to motions for summary judgment, are **GRANTED**. Ratcliff's state law battery claim is **DENIED**. The clerk must enter a judgment in favor of the Defendants and **CLOSE** this case.

ORDERED in Tampa, Florida, on _____9/29_____, 2023.

THOMAS P. BARBER
UNITED STATES DISTRICT JUDGE